UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

YOUNG ISRAEL OF TAMPA, INC.,

    Plaintiff,

v.                              Case No. 8:21-cv-294-VMC-CPT

HILLSBOROUGH AREA REGIONAL
TRANSIT AUTHORITY,

    Defendant.
_____/

**<u>ORDER</u>**

This matter comes before the Court upon consideration of the Motion for Summary Judgment filed on October 4, 2021, by Plaintiff Young Israel of Tampa, Inc. ("Young Israel") and the Amended Motion for Summary Judgment filed on October 8, 2021, by Defendant Hillsborough Area Regional Transit Authority ("HART"). (Doc. ## 60, 63). Both parties filed a response and a reply. (Doc. ## 64, 67-69). For the reasons that follow, the Court grants Young Israel's Motion and denies HART's Motion.

I.    **<u>Background</u>**

    A.    **<u>HART and HART's Advertising Policy</u>**

HART was created under Florida law and provides public transit in Hillsborough County, the City of Tampa, Florida, and the City of Temple Terrace, Florida. (Doc. # 1-1 at 6-

8). HART's Policy Manual contains an advertising policy (the "Policy"). (<u>Id.</u> at 142-48). The current, applicable version of the Policy went into effect on December 2, 2013. (<u>Id.</u> at 148). The Policy provides in relevant part:

> **(1)   Policy Statement**
>
> HART is engaged in commerce as a provider of public transportation services and the advertising space located on its public information pieces, buses, stops or other HART property constitutes a part of this commercial venture and is not intended to be and shall not be considered a public forum. The advertising accepted is intended to be strictly commercial in nature as further defined herein with limited Governmental Entity Public Service Announcements, as that term is defined below, including but not limited to HART's own such announcements. HART's objective in selling advertising on or in its vehicles or property is to maximize advertising revenues to supplement unfunded operating costs, while maximizing transit services revenue by attracting, maintaining, and increasing ridership. Maintaining a safe, welcoming environment for all HART passengers is part of HART's primary mission and is essential to maximizing revenues to accomplish that mission. The advertising revenues are secondary to HART's primary mission. HART intends to maximize advertising revenue by establishing a favorable environment to attract a lucrative mix of commercial advertisers. The goal is to maintain the value of HART advertising space by keeping it in good condition and non-controversial at the same time, endeavoring to ensure that the advertisement is not offensive to HART customers and the community.

**(2)  Advertising Program and Administration**

HART shall select an "Advertising Contractor" responsible for the administration of the HART advertising program consistent with HART's adopted policies and guidelines and its agreement with HART. HART shall designate an employee as its "Contract Administrator" to be the primary contact with the Advertising Contractor. The Advertising Contractor shall be the recipient of all advertising requests and shall be the one who initially addresses the application of HART guidelines thereto. Any question or disagreement in that regard shall be referred to the Contract Administrator for resolution. The Contract Administrator shall determine whether the advertisement in question is consistent with these policies and guidelines. . . . If a dispute remains unresolved, appeal may be made to the CEO or Chief Operating Officer of HART or his/her designee for final resolution.

. . .

**(4)  Prohibitions**

The following types of advertising are prohibited in and on all vehicles and/or property:

(a)  Except as provided with regard to the Tampa Historic Streetcar, advertising of tobacco, alcohol, or related products or activities;

(b)  Advertising containing profane language, obscene materials or images of nudity, similar adult themes, activities or products, including, but not limited to, pornography and any message offense to the community standards applicable to same;

(c)  Advertising containing discriminatory materials and/or messages;

(d) Advertisements for firearms or that contain an image or description of graphic violence . . .

**(e) Advertisements that primarily promote a religious faith or religious organization;**

(f) Partisan political advertisements which advocate any political party, or advocate and/or promote any candidate or issue upon which the electorate is scheduled to vote . . .;

(g) Advertisements that promote or have any material contained in it, that promotes, encourages or appears to promote or encourage, unlawful or illegal behavior or activities;

(h) Advertisements that promote a commercial transaction that has any material contained in it that is false, misleading, or deceptive;

(i) Advertisements, or any material contained therein that promotes or encourages or appears to promote or encourage the use or possession of unlawful or illegal goods or services; and

(j) Advertisements or any material contained therein that is libelous or an infringement of copyright, or is otherwise unlawful or illegal or likely to subject HART to litigation.

(Id. at 142-46 (emphasis added)).

The Policy also contains certain written "guidelines," including a definition of "commercial advertisement" as "an advertisement dealing with commercial speech which is an expression that proposes a commercial transaction related solely to an economic interest of the speaker and his or her

4

audience, but which is intended to influence consumers in their commercial decisions and usually involves advertising products or services for sale." (Id. at 144).

The current Policy has its genesis in an earlier controversy. In early 2013, HART rejected the "#MyJihad" advertisement submitted by the Council on American-Islamic Relations ("CAIR"). (Doc. # 63 at ¶ 2; Doc. # 67 at ¶ 2). Believing that the advertisement primarily promoted the Islamic religion, HART's Board of Directors (the "Board") rejected the advertisement at an August 5, 2013, meeting. (Doc. # 63 at ¶ 3; Doc. # 67 at ¶ 3).

According to the declaration of a HART representative, "[a]t the August [2013] Board meeting, HART's Board realized it needed to amend its Advertising Policy to close its forum to commercial advertising to avoid situations like it was facing with CAIR." (Doc. # 57-1 at ¶ 7). Young Israel points out that HART's policy at that time already limited the forum to "strictly commercial" advertisements and also prohibited advertisements "that primarily promote a religious faith or religious organization." (Doc. # 67-2; Doc. # 60-43).

CAIR appealed the denial of its advertisement and made a presentation to the Board in September 2013. (Doc. # 63 at ¶ 8; Doc. # 67 at ¶ 8). At the conclusion of that meeting,

the Board agreed to run a modified CAIR advertisement, which did not contain the "#MyJihad" language and instead read: "CAIR Florida, Embracing Diversity at Work, Defending Civil Rights in the Community." (Doc. # 57-1 at ¶ 9; Doc. # 57-4).

Shortly after the modified CAIR ads ran, the American Freedom Defense Initiative ("AFDI") sought to run advertisements that, as HART describes it, were "counter" to the CAIR ads. (Doc. # 57-1 at ¶ 11). AFDI submitted eight proposed advertisements. (Doc. # 57-6). One of the advertisements referenced "honor killings" and asked: "Is your family threatening you? Is your life in danger? We can help: go to FightforFreedom.us." (Id. at 1). Other ads quoted government officials to claim that "CAIR 'has ties to terrorism'" and "give[s] aid to international terrorist groups." (Id. at 4, 5). Others contained quotes from individuals allegedly defrauded, misled, or deceived by CAIR, along with the website "TruthAboutCAIR.com." (Id. at 2, 3, 7). HART refused to run AFDI's advertisements, and AFDI threatened to sue HART. (Doc. # 57-1 at ¶ 13).

Following the CAIR advertisement controversies and the August 2013 Board meeting, HART amended its advertising policy. (Doc. # 63 at ¶ 14; Doc. # 67 at ¶ 14). In December

2013, HART adopted the Advertising Policy currently in effect. (Doc. # 57-1 at ¶ 16).

According to HART, its refusal to accept primarily religious advertisements "is supported by HART's interests in ensuring safe and reliable transportation services and operating in a manner that maintains demand of its service . . . without alienating any riders, potential riders, employees, or advertisers. HART's policy is intended to maintain a safe environment on its vehicles without unnecessary controversy, risks of violence, or risks of vandalism while maintaining employee morale." (Doc. # 60-18 at 6). As HART's corporate representative explained, religious ads could be deemed controversial or "create a bad experience for our customers" "if somebody didn't agree with it and . . . they're upset about it." (Doc. # 60-8 at 80:11-20).

This prohibition on primarily religious advertisements applies without distinction between exterior spaces, such as bus exteriors or shelters, and bus interiors. (Doc. # 60-8 at 78:22-25). According to HART, "[a]pplication of HART's advertising guidelines are fact specific and analysis of a permissible ad, once brought to the CEO (or her designee), is

done on a fact-specific basis, with assistance from counsel, if necessary." (Doc. # 60-18 at 6).

Laurie Gage, an employee of Vector Media (HART's designated Advertising Contractor), is the first line of review under HART's Policy. (Doc. # 60-6 at 10, 13, 15-16). Gage testified that, outside of HART's written Advertising Policy, there are no guidance documents, advisory opinions, or other material available to help her implement or interpret the Policy. (Id. at 14). She has never received any training on how to apply the Policy. (Id. at 14-15). She also testified that if there was ever any question or concern about whether an advertisement was allowable under the Policy, she would forward the issue to HART. (Id. at 13, 80).

Tyler Rowland, HART's manager of communications and creative services, and who was deposed in his capacity as HART's corporate representative, stated that one of his responsibilities is reviewing submitted advertisements. (Doc. # 60-8 at 13). Rowland also testified that HART does not provide any guidance documents, advisory opinions, or other material to help interpret the Policy, and there is no training provided on the Policy. (Id. at 15). Rowland testified that, when determining whether an ad was "primarily promoting" a religious faith or organization, he would make

that determination on a case-by-case basis, depending on the ad's "design and . . . messaging." (Id. at 34-35).

HART admits that it does not know "what would specifically upset customers on religious ads" and it also admits that it has no record of disruptions, vandalism, or threats of violence attributable to any advertisement. (Doc. # 60 at ¶ 13; Doc. # 64 at ¶ 13).

**B.   Young Israel and the "Chanukah on Ice" Advertisement**

Young Israel is an Orthodox Jewish synagogue in Tampa, Florida, led by Rabbi Uriel Rivkin. (Doc. # 60 at ¶ 1; Doc. # 64 at ¶ 1). The synagogue has hundreds of attendees, conducts charitable endeavors, and reaches the community via publicly advertised celebrations of Jewish holidays like Passover and Chanukah. (Id.). For more than 14 years, Young Israel has hosted the Chanukah celebration "Chanukah on Ice." (Doc. # 60 at ¶ 2; Doc. # 64 at ¶ 2). Chanukah is a Jewish festival commemorating a miracle in which the oil in the holy temple, meant to last only one day, instead lasted for eight. (Doc. # 60-4 at 15:23-16:9).

According to Rabbi Rivkin, Chanukah on Ice is a "very big event" with "at least 200 people" typically in attendance.

(Doc. # 60-4 at 17, 28; Doc. # 60-2 at 3).[1] Rabbi Rivkin stated that the Chanukah on Ice event was part of the synagogue's outreach to the community and "offers a crucial opportunity to foster Jewish identity during a season many associate with Christmas." (Doc. # 60-2 at 2-3).

The event begins with an hour of ice skating with Jewish music playing and Jewish food available. (Doc. # 60 at ¶ 3; Doc. # 64 at ¶ 3; Doc. # 60-4 at 28:11-23, 29:24-30:3). Next, Rabbi Rivkin lights a large ice menorah and offers blessings. (Doc. # 60 at ¶ 3; Doc. # 64 at ¶ 3; Doc. # 60-4 at 30:4-16). Attendees sing Jewish songs, and Rabbi Rivkin speaks about the Chanukah miracle. (Id.). Rabbi Rivkin testified that, in his opinion, the menorah is a Jewish religious symbol celebrating Chanukah. (Doc. # 60-4 at 18:25-19:3).

Rabbi Rivkin usually begins planning Chanukah on Ice in September by booking a rink. (Doc. # 60-4 at 54:18-55:8). In

---

[1] HART takes issue with most of the exhibits attached to Young Israel's summary judgment Motion because they were submitted as attachments to a lawyer's affidavit. (Doc. # 64 at 2-7). HART misunderstands the Court's requirements in this respect. While lawyers may not submit affidavits as proof of substantive facts, counsel's affidavit here was submitted solely as the vehicle by which other, admissible evidence was submitted. Thus, the Court will consider the documents submitted by Young Israel. Furthermore, while HART also objects to "rank hearsay documents," it does not identify which documents it means or why those documents are hearsay.

2019, Young Israel hosted Chanukah on Ice at the AdventHealth Center Ice Rink, which is near the synagogue, on one HART bus line, and near another. (Doc. # 60-2 at 3). Young Israel has historically promoted the event through advertising in Jewish press publications and on Facebook. (Doc. # 60-4 at 32:24-33:7). For 14 years, Young Israel has utilized essentially the same print ad, which features a menorah and a dreidel. (Doc. # 60-4 at 104:3-9). Rabbi Rivkin testified that the dreidel is a Jewish cultural symbol. (Id. at 106:15-107:17).

On October 30, 2020, Young Israel sent HART its proposed Chanukah on Ice advertisement "to run in the HART transit system in late November through December." (Doc. # 1-2 at 2). The advertisement included the details of the Chanukah on Ice event and contained images of a menorah, a dreidel, and ice skaters. (Id. at 3). It stated that the event would "feature[e] lighting of a sculpted Grand Ice Menorah and ice skating to Jewish music around the flaming menorah." (Id.). The advertisement is reproduced below:



On November 2, 2020, Gage, an employee with Vector Media, rejected the ad, writing: "Thank you for writing, unfortunately we cannot assist. HART does not allow religious affiliation advertising, as well as banning adult, alcohol,

tobacco, and political ads. Thank you again for your interest." (Doc. # 1-3).

Young Israel expressed its "disappoint[ment]" with the decision and thereafter contacted the agency's interim CEO to initiate an appeal of the decision. (Doc. # 1-4; Doc. # 1-6). At that point, HART's interim CEO, legal counsel, and communications manager met and concluded that, "based off . . . legal counsel's knowledge of what the menorah meant," the ad was primarily focused on a "religion-based icon" and therefore violated HART's advertising policy. (Doc. # 60-8 at 67:9-13, 70:5-12, 88:6-15). HART's corporate representative testified that while he "assume[d]" that the word Chanukah was a religious term, if the focus of the advertisement "stay[ed] towards the ice skating and the event and the celebration, then we can . . . work within those parameters and still not be violating our [P]olicy." (Doc. # 60-8 at 74:18-75:3).

Accordingly, on December 8, 2020, Rowland, in his role as HART's communications manager, emailed Rabbi Rivkin with "suggested edits" to the print advertisement, including removing the picture of the menorah and all uses of the word "menorah." (Doc. # 1-7). Rabbi Rivkin testified that he found it "offensive" that HART would seek to take out all references

13

to the menorah. (Doc. # 60-4 at 131:4-16, 131:1-5). He told HART that the proposed changes were "not possible to make" because the lighting of the menorah "is a central aspect of the Orthodox Jewish celebration of Chanukah," and he asked HART to run the ad as originally submitted. (Doc. # 1-8). On December 15, 2020, HART formally refused to run the Chanukah on Ice advertisement. (Doc. # 1-9). HART's interim CEO said that this decision was "consistent with prior determinations involving similar advertisement requests under this policy." (Id.).

### C.   **Procedural History**

Young Israel initiated this case on February 5, 2021, asserting multiple claims of First Amendment free speech and freedom of religion violations, as well as violations of its Fourteenth Amendment equal protection and due process rights. (Doc. # 1). HART filed its answer on March 2, 2021. (Doc. # 17). The case proceeded through discovery. The parties now both move for summary judgment. (Doc. ## 60, 63). The Motions are fully briefed and ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue

for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." <u>Shaw Constructors v. ICF Kaiser Eng'rs, Inc.</u>, 395 F.3d 533, 538–

39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." (quotation omitted)).

### III. **Analysis**

Young Israel argues that HART's Advertising Policy is facially unconstitutional in four respects. First, it argues that the Policy violates the First Amendment's Free Speech Clause because it discriminates based on viewpoint, specifically a religious viewpoint. (Doc. # 60 at 1, 12-16). Second, even if the Policy is viewpoint-neutral, Young Israel argues that it violates the Free Speech Clause because it is an unreasonable restriction based on content. (Id. at 1-2, 18-20). Third, Young Israel contends that the Policy is also unconstitutional because it is standardless and arbitrary. (Id. at 2, 20-23). Finally, according to Young Israel, the Policy violates the Free Exercise Clause because it singles out religion for disfavored treatment. (Id. at 2, 23-25).

For its part, HART argues that it is entitled to summary judgment on all of Young Israel's claims because HART's property is a non-public forum. (Doc. # 63 at 12-16).

17

Furthermore, it contends that non-public forums may reasonably restrict speech, and that HART's Policy is reasonable. (Id. at 16-21). Finally, HART claims that it has not arbitrarily or inconsistently applied its Policy. (Id. at 21-24).

### A.    **Viewpoint Discrimination**

"The First Amendment prohibits the political restriction of speech in simple but definite terms: 'Congress shall make no law . . . abridging the freedom of speech.' Those same terms, and their guarantee of free speech, now apply to states and municipalities as well as to the federal government." Otto v. City of Boca Raton, 981 F.3d 854, 860-61 (11th Cir. 2020) (quoting U.S. Const. amend. I). As the Supreme Court has explained:

> When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 818, 829 (1995) (internal citations omitted).

The parties dispute whether this Court must make a threshold determination of into which government forum HART's

ad space falls.[2] For reasons more fully described below, the Court finds a recent decision from the Third Circuit Court of Appeals to be persuasive, and that case held that "no matter what kind of property is at issue, viewpoint discrimination is out of bounds." Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys., 938 F.3d 424, 432 (3d Cir. 2019). Additionally, "even in a non-public forum," as HART claims its property to be, "the law is clearly established that the state cannot engage in viewpoint discrimination — that is, the government cannot discriminate in access to the forum on the basis of the government's opposition to the speaker's viewpoint." Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d 1313, 1321 (11th Cir. 2005).

---

[2] As HART notes, caselaw has identified various types of government forums. See United States v. Kokinda, 497 U.S. 720, 726–27 (1990) (explaining the "tripartite framework" for analyzing First Amendment interests with respect to government property and the various levels of scrutiny afforded to each forum (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45–46 (1983)); see also Barrett v. Walker Cty. Sch. Dist., 872 F.3d 1209, 1224–25 (11th Cir. 2017) (identifying four categories of government fora — the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum — and explaining that, in earlier Supreme Court precedent, "the term 'nonpublic forum' was synonymous with 'limited public forum'"). HART claims that its property qualifies as a nonpublic forum.

The Supreme Court has published a trilogy of cases explaining the law on viewpoint discrimination with respect to religion. In the first,

> [A] school district had opened school facilities for use after school hours by community groups for a wide variety of social, civic, and recreational purposes. The district, however, had enacted a formal policy against opening facilities to groups for religious purposes. Invoking its policy, the district rejected a request from a group desiring to show a film series addressing various child-rearing questions from a "Christian perspective." . . . [The Supreme Court's] conclusion was unanimous: "It discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and childrearing except those dealing with the subject matter from a religious standpoint."

Rosenberger, 515 U.S. at 830 (citing Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 386-90 (1993)).

The Supreme Court revisited this subject just two years after Lamb's Chapel with its decision in Rosenberger. The issue in that case was a university's decision to withhold funding from a student publication that published articles with a religious perspective. Rosenberger, 515 U.S. at 823-27. In that case, the University, as HART does here, insisted that its stated guidelines "draw lines based on content, not viewpoint" because it equally denied funding to any "religious activity," which was defined in the relevant guidelines as any activity that "primarily promotes or

20

manifests a particular belie[f] in or about a deity or an ultimate reality." Id. at 825, 830. This argument gained traction with the four-justice dissent. Justice Souter wrote that:

> If the Guidelines were written or applied so as to limit only such Christian advocacy and no other evangelical efforts that might compete with it, the discrimination would be based on viewpoint. But that is not what the regulation authorizes; it applies to Muslim and Jewish and Buddhist advocacy as well as to Christian. And since it limits funding to activities promoting or manifesting a particular belief not only "in" but "about" a deity or ultimate reality, it applies to agnostics and atheists as well as it does to deists and theists. . . . [The University] simply [denies] funding for hortatory speech that 'primarily promotes or manifests' any view on the merits of religion; they deny funding on the entire subject of religious apologetics. . . . If this amounts to viewpoint discrimination, the Court has all but eviscerated the line between viewpoint and content.

Id. at 895-98 (Souter, J., dissenting).

The five-justice majority, however, rejected this argument because it "reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech." Further, "[t]he dissent's declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways." Id. at 831-32.

While acknowledging that the distinction between viewpoint and content in the context of religion "is not a precise one," the majority concluded that viewpoint discrimination was the proper way to interpret the University's objections to the student publication. The Court determined that the "prohibited [religious] perspective, not the general subject matter, resulted in the refusal to make third-party payments, for the subjects discussed [in the publication] were otherwise within the approved category of publications." Id. at 831.

In the years that followed Rosenberger's release, a circuit split developed on the question of "whether speech can be excluded from a limited public forum on the basis of the religious nature of the speech." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 105-06 (2001). In Good News Club, a local private Christian organization for children sought permission to hold the group's weekly afterschool meetings in a school cafeteria. Id. at 103. However, the school's community use policy, which prohibited use "by any individual or organization for religious purposes," foreclosed the group's request. Id.

Relying heavily on its prior precedents in Lamb's Chapel and Rosenberger, the Court held that the exclusion

constituted impermissible viewpoint discrimination. Id. at
107. The Court explained that the school's policy allowed
groups that would promote the moral and character development
of children, but it excluded the Club's activities because
they were religious in nature. Id. at 108. In other words,
using Aesop's Fables to teach children moral values or
allowing the Boy Scouts to meet to develop a child's character
was permissible, but allowing a Christian group to do the
same was not allowed. This was impermissible viewpoint
discrimination. Id. at 108-09. The Court in Good News Club
therefore "reaffirm[ed]" its prior holdings and held that
"speech discussing otherwise permissible subjects cannot be
excluded from a limited public forum on the ground that the
subject is discussed from a religious viewpoint." Id. at 112.

Here, HART seeks to avoid the implication of this Supreme
Court precedent by pointing out that those decisions all
involved schools, not public transit. As the parties note in
their briefing, two Circuit Courts of Appeal have addressed
this Supreme Court trilogy in the context of advertisements
on public transit and have reached opposite conclusions.

In 2018, the D.C. Circuit addressed a policy enacted by
the transit authority that provides service to the
Washington, D.C. metro area ("WMATA") – which policy banned

"issue-oriented ads, including political, religious, and advocacy ads." Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 897 F.3d 314, 318 (D.C. Cir. 2018). There, the D.C. Circuit considered an advertisement submitted by a Catholic archdiocese that depicted a starry night and the silhouettes of three shepherds and sheep on a hill facing a bright shining star high in the sky, along with the words "Find the Perfect Gift." Id. at 467. The Court upheld the policy because it regulated subject matter, not viewpoint. Id. at 325; see also Rosenberger, 515 U.S. at 829-30 (observing a difference between "content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations").

Conversely, in 2019, the Third Circuit (in a 2-1 opinion), determined that the County of Lackawanna Transit System, which operates the bus transit service in Scranton, Pennsylvania, ran afoul of the First Amendment when it enacted a policy with prohibitions on religious messages. Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys., 938 F.3d 424, 432 (3d Cir. 2019). In Freethought, the plaintiff group (an "association of atheists, agnostics, secularists,

24

and skeptics") proposed an ad displaying the word "Atheists" along with the group's name and website on public transit run by the defendant. Id. at 428. The Third Circuit in that case expressly rejected the reasoning set forth by its sister court in Archdiocese of Washington. Id. at 436-37.[3]

The Court has carefully read and considered each of these Circuit cases, which are persuasive but not binding upon it. The Eleventh Circuit has not yet published a decision on this topic. In this Court's view, the Third Circuit's approach better conforms to the prevailing Supreme Court caselaw on the issue of religious viewpoint discrimination.[4]

---

[3] For a more fulsome description of the facts and holdings in Archdiocese of Washington and Freethought and the resulting Circuit split, readers may refer to the following law review article. Jonathan P. Rava, Note, Religious Advertisements Sparking Debates on Buses: A Circuit Split on Viewpoint Versus Content-Based Discrimination, 21 Rutgers J. L. & Religion 502 (2021).

[4] The Court makes this determination on the basis of controlling and published Supreme Court precedents. Still, the Court notes a statement made by Justice Gorsuch, joined by Justice Thomas, that accompanied the Supreme Court's denial of certiorari in the Archdiocese of Washington case. That statement made clear that at least a faction of the Court favored the Third Circuit's analysis and, had the Court taken up the case, "a reversal would be warranted for reasons admirably explained by Judge Griffith in his dissent below and by Judge Hardiman in [Freethought]." Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 140 S. Ct. 1198, 1199 (2020) (denying certiorari). As Justice Gorsuch explains it, "[n]o one disputes that, if Macy's had sought to place the same advertisement along with its own website address,

Here, HART's Advertising Policy constitutes viewpoint discrimination. The record demonstrates that HART allowed advertisements for a secular holiday event with ice skating and seasonal food (Doc. # 60-21), but it disallowed an ice-skating event with seasonal food that was in celebration of Chanukah. Thus, HART's ban on advertisements that "primarily promote a religious faith or religious organization" targets the "specific motivating ideology or the opinion or perspective of the speaker." See Rosenberger, 515 U.S. at 829.

The distinction is drawn even more clearly in this case, where HART expressly suggested edits to the print ad that removed all references to and images of the menorah, which both parties agree is considered a Jewish religious symbol. (Doc. # 60-4 at 18:25-19:3; Doc. # 60-8 at 70:5-12). So HART impliedly would have allowed an advertisement of the *exact same event* if presented with secular symbols or emphasizing

---

[WMATA] would have accepted the business gladly. . . . That is viewpoint discrimination by a governmental entity and a violation of the First Amendment." (Id.). Pointing to the Court's precedents in Lamb's Chapel, Rosenberger, and Good News Club, Justice Gorsuch wrote that "this Court has already rejected no-religious-speech policies materially identical to WMATA's on no fewer than three occasions[.] . . . What WMATA did here is no different."). (Id.).

a secular viewpoint, but it was not allowed if presented with religious symbols or emphasizing a religious viewpoint. The Court therefore sees no difference between these facts and those in Good News Club, where a school could invite children to learn "morals and character" in the Boy Scouts, or in some other non-religious fashion, but not in a Bible club. See 533 U.S. at 108.

What's more, as the Third Circuit explained in Freethought, the advertisement there related to the subject of religion "writ large." 938 F.3d at 435. "But at its core, its message is one of organizational existence, identity, and outreach. . . . What matters for the viewpoint discrimination inquiry isn't how religious a message is, but whether it communicates a religious (or atheistic) viewpoint on a subject to which the forum is otherwise open." Id.

Here, Rabbi Rivkin stated that the synagogue's Chanukah on Ice event was a means of outreach to the community and an expression of Jewish identity. (Doc. # 60-2 at 2-3). HART disallowed this statement of organizational existence, identity, and outreach, and yet it allowed outreach messages from Alcoholics Anonymous ("Is Alcohol a Problem? Call Alcoholics Anonymous"), the Ronald McDonald House Charities ("Joy Is One of the Best Gifts You Can Give"), and Florida

Healthy Transitions ("We're here to help. You are not alone."). (Doc. # 60-23; Doc. # 60-24; Doc. # 60-40).

HART argues that because its Policy contains a ban on **any** advertisements that "primarily promote a religious faith or religious organization," it is a permissible subject-matter based restriction. See (Doc. # 64 at 15 ("HART's policy makes a subject-matter based restriction, not a viewpoint restriction.")). HART also argues that the Supreme Court trilogy of Lamb's Chapel, Rosenberger, and Good News Club is distinguishable because in those cases the religious group sought to address a subject otherwise permitted under the rule or policy and was silenced from expressing their views on that topic through a religious lens. (Doc. # 64 at 15-16). They argue that, here, HART's Policy is limited to "commercial endeavors," and it "prohibits all content-based advertisements that would promote a religion or religious viewpoint." (Id. at 16-18). Thus, the Policy "lawfully prohibits the entire subject matter of religion since it only allows commercial advertisements." (Id. at 18).

But this argument has been repeatedly rejected by the Supreme Court. See Byrne v. Rutledge, 623 F.3d 46, 58 (2d Cir. 2010) ("[The government] contends that because the law bans 'all speech on' religion 'whether positive, negative, or

neutral' it is, 'by definition viewpoint-neutral.' In the context of restrictions on all religious speech, this argument has been expressly considered – and rejected – by the Supreme Court.").

The Court agrees with Young Israel that this argument was precisely the one made by Justice Souter in his dissent in Rosenberger and was explicitly rejected by the majority opinion. Even before Rosenberger, the Court in Lamb's Chapel wrote that:

> The Court of Appeals thought that the application of [the district policy] in this case was viewpoint neutral because it had been, and would be, applied in the same way to all uses of school property for religious purposes. That all religions and all uses for religious purposes are treated alike under [the policy], however, does not answer the critical question whether it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint.

Lamb's Chapel, 508 U.S. at 392-93. And in Good News Club, the Court explicitly wrote that: "Although in Rosenberger there was no prohibition on religion as a subject matter, our holding did not rely on this factor. Instead, we concluded simply that the university's denial of funding to print [the religious student publication] was viewpoint discrimination, just as the school district's refusal to allow Lamb's Chapel

to show its films was viewpoint discrimination." <u>Good News</u> <u>Club</u>, 533 U.S. at 110; <u>see also</u> <u>Freethought</u>, 938 F.3d at 434 (explaining that <u>Good News Club</u> "foreclosed the argument that a broad prohibition on religious speech can validate religious viewpoint discrimination").

In sum, HART's Advertising Policy, both on its face and in its application to this Plaintiff, is a denial of Young Israel's right to free speech under the First Amendment. <u>See</u> <u>Otto</u>, 981 F.3d at 864 (while not adopting a per se rule, noting that "there is an argument that [viewpoint discriminatory] regulations are unconstitutional per se"); <u>see also</u> <u>Rosenberger</u>, 515 U.S. at 837 (writing that "[d]iscrimination against speech because of its message is presumed to be unconstitutional" and, once determining that the University's guidelines were viewpoint discriminatory, therefore holding them unconstitutional); <u>Good News Club</u>, 533 U.S. at 107-08 (invalidating the applicable policy as viewpoint discriminatory and not even reaching the issue of whether it was unreasonable in light of the purposes served by the forum).

### B.  **Reasonableness**

Even if HART's Advertising Policy were viewpoint neutral, it would still need to be reasonable in light of the

purposes of the forum.[5] <u>Freethought</u>, 938 F.3d at 437; <u>see also</u> <u>Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 473 U.S. 788, 806 (1985) ("[A]ccess to a nonpublic forum can be based upon subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.").

When it comes to reasonableness, the Supreme Court has recently held that the government "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." <u>Minn. Voters All. v. Mansky</u>, 138 S. Ct. 1876, 1888 (2018). In other words, there must be "objective, workable standards" guiding the regulation's enforcement. <u>Id.</u> at 1891. Young Israel argues that HART lacks such workable standards in enforcing the Policy. (Doc. # 60 at 20-23). The Court agrees.

The Eleventh Circuit recently described the <u>Mansky</u> decision in this way:

> The Supreme Court has made it clear that even in a nonpublic forum the government must avoid the haphazard and arbitrary enforcement of speech restrictions in order for them to be upheld as reasonable.     Thus,     for     example, in <u>Minnesota Voters Alliance v. Mansky</u>,     the

---

[5] The parties appear to agree for purposes of this argument that HART property is either a nonpublic forum or a limited public forum.  Both are subject to the same restrictions and level of scrutiny.

Supreme Court invalidated a state law prohibiting voters from wearing certain kinds of expressive clothing and accessories inside the polling place. The Minnesota law at issue prohibited voters from wearing any "political badge, political button, or other political insignia." The Court determined that the polling place was a nonpublic forum, that the law did not facially discriminate on the basis of viewpoint, and that it was reasonable for the State to determine that "some forms of advocacy should be excluded from the polling place, to set it aside as 'an island of calm in which voters can peacefully contemplate their choices.'" But the Court determined that the law still failed the reasonableness test because the ban on "political" apparel was too indeterminate and haphazardly applied.

Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc., 942 F.3d 1215, 1243 (11th Cir. 2019) (citations omitted) (holding that plaintiff school plausibly alleged that the speech restriction imposed – a ban on prayer over the loudspeaker at a high school football game – was applied arbitrarily and haphazardly in violation of Mansky).

There is no controlling Eleventh Circuit opinion interpreting Mansky in the context of a rapid transit service. Again, the Court looks to persuasive guidance from outside this Circuit. This time it turns to a case originating from the Sixth Circuit Court of Appeals, in which the Court applied Mansky's standard to strike down a transit system's prohibition on "political" speech. Am. Freedom Def.

Initiative v. Suburban Mobility Auth. for Reg'l Transp. ("SMART"), 978 F.3d 481, 498 (6th Cir. 2020).

To begin, the Court agrees with the Sixth Circuit that HART's prohibition on certain types of advertisements serves "permissible" ends. HART aims to maintain a "safe, welcoming environment" for its passengers without alienating any riders, potential riders, employees, or advertisers. (Doc. # 1-1 at 142; Doc. # 60-18 at 6). See SMART, 978 F.3d at 494 (finding it permissible that the SMART transit system sought to minimize the chances of abuse, appearance of favoritism, and risk of imposing upon a captive audience). Nevertheless, HART must adopt "objective, workable standards" to achieve its permissible ends. See Mansky, 138 S. Ct. at 1891.

But HART's Policy fails to do so for similar reasons articulated by the Court in SMART. First, the word "religious" is unadorned and unexplained in the Policy. This word, like the word "political," has a range of meanings and can be interpreted differently by different people. See SMART, 978 F.3d at 494.

And HART admits that, outside of the Policy itself, there is no additional written guidance or training given by HART on how to interpret the Policy. (Doc. # 64 at ¶ 18). As in

SMART, this lack of guidance "has caused inconsistency in how [HART] agents define it." 978 F.3d at 495.

For example, Rowland testified that whether an ad contains religious symbols would be based on the background knowledge and professional experience of the HART employee applying it. (Doc. # 60-8 at 72:9-12). So, Rowland testified that Macy's would be allowed to run a "holiday-based ad" with the slogan "Perfect Gift Sale" that included certain percentages off items, but if a church ran an ad with the slogan "Find the Perfect Gift" that was meant to promote the church, that "would fall into the primarily promoting a religious organization" prohibition. (Id. at 38-42). Rowland struggled to describe why these two hypothetical advertisements might be treated differently, saying at various times that it would depend on the advertisement's "call to action," whether the advertising client is "known" to the HART employee based on their professional experience, or whether the HART employee perceives the ad's design to focus on religious symbols. (Id. at 39-42, 77-78).

Similarly, when presented with the same hypothetical Macy's ad, Laurie Gage, the employee of HART's advertising contractor and the first line of review for submitted advertisements, stated that "the Young Israel ad clearly had

[a] lot of religious wording and imagery, whereas this has Christmas gifts. This is neutral." (Doc. # 60-6 at 24:12-14). In a similar vein, Gage testified that she would forward to HART an advertisement containing Easter eggs because it was "possible" that there is a secular component to Easter. (Id. at 80:7-25 (specifically, when asked whether there's a "secular half of Easter," Gage responded that "[a]nything is possible")). If, however, an advertisement said "Easter," that would "maybe" necessitate a conversation with the advertiser and Gage would forward the ad to HART officials. (Id. at 81:3-8). But for the Young Israel ad, Gage acknowledged that she denied the request out of hand, without ever sending it along to HART. (Id. at 81:19-22).

Nor is there any clarity on how an advertisement could "primarily," as opposed to incidentally, or in some other way, "promote a religious faith or religious organization." HART's corporate representative conceded that, when determining whether an ad was "primarily promoting" a religious faith or organization, he would make that determination on a case-by-case basis, depending on the ad's "design and . . . messaging." (Doc. # 60-8 at 34:18-35:2; see also Id. at 47:1-8, 43:20-44:5 (stating that if the advertiser is not a religious organization, then religious symbols might

just be artwork and the determination of how to tell the difference between the two is "subjective" and subject to his "professional experience").

Like the SMART court, the undersigned will now "[t]urn to process. How should officials decide if an ad is [primarily promoting a religious faith or religious organization]? Should they limit themselves to the ad's four corners? Or should they consider related content like information on websites?" SMART, 978 F.3d at 495. Like the Sixth Circuit, there is no official guidance to answer these questions and the Court again sees inconsistencies.

For example, while HART now claims that it does not review an organization's website to determine whether an ad violates the Policy, it has repeatedly done so in the past, and its contractor testified that she sometimes looked at clients' websites "[i]f time permitted and [she] was curious enough." (Doc. # 60-8 at 93:17-19; Doc. # 60-6 at 73:13-18; Doc. # 60-28; Doc. # 60-39). HART also conceded that "different people in the same roles [could] have different methodologies" for reviewing submitted advertisements' compliance with the Policy. (Doc. # 60-8 at 96:18-20).

Young Israel also proffered evidence[6] that HART had previously rejected an advertisement from St. Joseph's Hospital based on information on the hospital's website that it was "[f]ounded as a mission by the Franciscan Sisters of Allegany," but would accept the ad if the client used the name of its parent company, Baycare. (Doc. # 60-38). HART, however, ran ads from St. Leo University with no such changes.[7] (Doc. # 60-37). HART explains that it permitted these ads because St. Leo is an "institution of higher learning, not a religious organization." (Doc. # 60-18 at 3). What if, for example, a private Catholic girls' school or a preschool affiliated with a church or synagogue wished to advertise on HART? Would it matter if the organization was "primarily" a school or "primarily" a religious organization? Who would make that decision? And what would be their

---

[6] The Court is aware that HART objects to this evidence and others like it, claiming that it is outside the record. The Court notes, however, that these documents, such as internal HART emails, contain HART Bates stamps and were, presumably, produced by HART in discovery. See Commercial Data Servers, Inc. v. Int'l Bus. Mach. Corp., 262 F. Supp. 2d 50, 58 (S.D.N.Y. 2003) ("It is disingenuous and wasteful for [CDS] to object that its own documents are not authenticated").

[7] According to its website, St. Leo University is "the oldest Catholic institution of higher education in Florida" and was "established in 1889 by the Order of Saint Benedict of Florida." See St. Leo University, About Us, https://www.saintleo.edu/about (last visited Jan. 15, 2022).

criteria? Would it matter if the school's advertisement contained religious symbols or phrases? If so, which religious symbols or phrases qualify? Without workable, objective standards, the Court does not know the answer to these questions and neither does HART.

In sum, the record evidence establishes that HART's application and enforcement of the Policy is inconsistent and haphazard. See Cambridge, 942 F.3d at 1243-44 ("Permitting certain speech on Monday, Tuesday, Wednesday, and Thursday and barring precisely the same message on Friday without any credible explanation of what may have changed is the essence of arbitrary, capricious, and haphazard — and therefore unreasonable — decisionmaking."); see also Mansky, 138 S. Ct. at 1891 ("A shirt simply displaying the text of the Second Amendment? Prohibited. But a shirt with the text of the First Amendment? It would be allowed."). Under Mansky, this violates the First Amendment. As the Sixth Circuit explained:

> Up to now, SMART has not written down "objective, workable standards" to define the word "political" and guide officials on the steps to take when deciding if specific ads qualify. Officials thus have had to apply the ban on the fly on a "case-by-case basis." But [under Mansky] the subjective enforcement of an "indeterminate prohibition" increases the "opportunity for abuse" in its application. The First Amendment favors rules over

standards because the former make an administrator's job largely ministerial whereas the latter leave room for the administrator to rely on "impermissible factors." . . . As in <u>Mansky</u>, we do not question that SMART seeks to act in an "evenhanded manner," but it has yet to create the workable standards that it needs for "reasoned application" of its ban.

<u>SMART</u>, 978 F.3d at 497. The same is true here.

## IV.  **Conclusion**

All counts in Young Israel's complaint center on the constitutionality of HART's Advertising Policy. <u>See</u> (Doc. # 1). Having found that summary judgment can be properly granted in Young Israel's favor because the Policy is viewpoint discriminatory and unreasonable, and therefore in violation of the Free Speech Clause, the Court declines to address arguments in Young Israel's Motion for Summary Judgment relating to the Free Exercise, Equal Protection, or Due Process Clauses.

Finally, the Court is aware that Young Israel has requested both declaratory relief and a permanent injunction. <u>See</u> (Doc. # 1). The parties are directed to confer and, by February 10, 2022, submit proposed joint language for the declaratory judgment and permanent injunction for the Court's consideration.  The parties may submit this with their joint final pretrial statement or as a separate document.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)    Plaintiff Young Israel of Tampa, Inc.'s Motion for Summary Judgment (Doc. # 60) is **GRANTED.**

(2)    Defendant HART's Amended Motion for Summary Judgment (Doc. # 63) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 20th day of January, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE